UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PALMETTO ADVISORS II LLC,<br>Plaintiff,<br>-v.-<br>EQUINITI TRUST COMPANY, LLC *formerly known as* AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC,<br>Defendant. | 25 Civ. 7578 (KPF)<br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

A sophisticated financial transaction went awry. Plaintiff Palmetto Advisors II LLC and Robert D. Reid IV, the sole trustee of the trust that is Plaintiff's only member, each owned shares in a company called Rigetti Computing, Inc. ("Rigetti"). Defendant Equiniti Trust Company, LLC (formerly known as American Stock Transfer & Trust Company, LLC or AST) was Rigetti's transfer agent and, in that context, kept a record of who owned Rigetti stock. In June 2023, Mr. Reid directed Defendant to transfer certain of Plaintiff's Rigetti shares to Plaintiff's brokerage accounts. But Mr. Reid's directive contained erroneous instructions that Defendant did not catch, resulting in what is alleged to be a $10.8 million mistake.

Plaintiff's Rigetti shares were subject to various restrictions — some imposed by the Securities and Exchange Commission (the "SEC") and some by Rigetti itself as the issuer (referred to as the "SEC Restrictions" and the "Issuer Restrictions," respectively). As relevant here, the Issuer Restrictions barred Plaintiff from selling or transferring certain Rigetti shares until the stock price

met specific dollar thresholds. In June 2023, when Defendant transferred the Rigetti shares to Plaintiff's brokerage accounts, some of those shares were still subject to Issuer Restrictions and could not in fact be transferred. No one realized this mistake until months later — after Mr. Reid had offloaded all of Plaintiff's Rigetti shares by either selling them or donating them to charitable causes — when the Issuer Restrictions lifted but Plaintiff had no more shares left to sell.

As a result of this revelation, Plaintiff pursued legal recourse in two fora. *First*, pursuant to a mandatory provision in the relevant agreement, Plaintiff commenced an arbitration proceeding against the manager of its brokerage accounts, Piper Sandler & Co. ("Piper Sandler"). *Second*, Plaintiff sued Defendant in this Court, alleging various tort and contract claims. Before the Court is Defendant's motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court grants in part and denies in part Defendant's motion.

## BACKGROUND[1]

### A. Factual Background

#### 1. Plaintiff Acquires 2,293,905 Rigetti Shares and Mr. Reid Acquires 136,250 Rigetti Shares

To understand the $10.8 million mistake, it is important to understand the various financial transactions that allegedly led to it, as well as the

1 This Opinion draws its facts from the Complaint ("Compl." (Dkt. #1)), the well-pleaded allegations of which are taken as true for purposes of this Opinion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). The Court also relies, as appropriate, on certain of the exhibits attached to the Complaint ("Compl., Ex. [ ]") and to the Declaration of Mark A.

complicated web of relationships among the various entities involved. At the center is Mr. Reid, a sophisticated investor with decades of industry experience. (*See* Harmon Decl., Ex. A at 43; *see also* Pl. Opp. 1, 21). Mr. Reid is the sole trustee of the trust that is the only member of Plaintiff. (Compl. ¶ 4). Mr. Reid was also the CEO of Supernova Partners LLC, which acts as a sponsor to special purpose acquisition companies ("SPACs"). (*Id.* ¶ 10).

SPACs are shell companies that raise money from investors and then search for private companies to take public through mergers or acquisitions. (*See* Compl. ¶ 11). In essence, a SPAC raises capital through an initial public offering ("IPO") without yet having identified a target private company, and thereafter goes into the investing world to find its mark. (*Id.*).

In this case, Supernova Partners LLC was the sponsor for a SPAC called Supernova Partners Acquisition Company, II (the "Supernova SPAC"). (Compl. ¶ 12). The Supernova SPAC raised capital and completed its public offering, and then on March 2, 2022, merged with Rigetti, a pioneer of scalable quantum computing. (*Id.*). Because Mr. Reid was the CEO of Supernova Partners LLC and the sole trustee of the only member of Plaintiff, through this transaction Plaintiff acquired millions of shares in Rigetti. (*See id.* ¶¶ 4, 10, 14).

---

Harmon in support of Defendant's motion to dismiss ("Harmon Decl., Ex. [ ]" (Dkt. #20)), each of which, if relied upon, the Court deems as incorporated by reference in the Complaint. *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

For ease of reference, the Court refers to Defendant's memorandum of law in support of its motion to dismiss as "Def. Br." (Dkt. #17); to Plaintiff's memorandum of law in opposition to Defendant's motion as "Pl. Opp." (Dkt. #24); and to Defendant's reply memorandum of law as "Def. Reply" (Dkt. #25).

Specifically, Supernova Partners LLC had four principals, one of whom was Mr. Reid. (*Id.* ¶ 14 & n.1). Rigetti's merger with the Supernova SPAC therefore yielded Plaintiff 27%, or 2,293,905, of Rigetti's "Founder Shares." (*Id.* ¶ 14).

All Rigetti shares, however, were subject to restrictions. (Compl. ¶¶ 14-20). Pursuant to SEC rules, none of Plaintiff's 2,293,905 Founder Shares could be sold until after September 3, 2022. (*Id.* ¶ 20). After that date, the SEC Restrictions on 1,460,253 of the Founder Shares expired, but the rest of Plaintiff's Founder Shares (833,652 in total) were still subject to Issuer Restrictions for five years. (*Id.*). In order for those remaining 833,652 Founder Shares to be sellable during that five-year period, Rigetti's stock price had to meet a specific dollar threshold. (*Id.*). For 675,528 of these still restricted Founder Shares, the stock price had to equal or exceed $12.50 for any twenty trading days within a period of thirty consecutive trading days. (*Id.*). For the remaining 158,124 Founder Shares, the price was $15.00. (*Id.*).

Mr. Reid separately acquired 136,250 Rigetti shares for himself through a different transaction known as a private investment in public equity ("PIPE") offering (the "PIPE Shares"). (Compl. ¶ 13). These PIPE shares were subject to different restrictions than the Founder Shares. They were not subject to the Issuer Restrictions. (*Id.* ¶ 19). And a different set of SEC Restrictions applied, which prevented the PIPE Shares' sale until after the SEC deemed Rigetti's Registration Statement effective. (*Id.*).

### 2. Defendant and Rigetti Enter into the Transfer Agency Agreement

In March 2022, Defendant and Rigetti entered into a Transfer Agency and Registrar Services Agreement (the "Transfer Agency Agreement" or the "Agreement"), pursuant to which Defendant would serve as the transfer agent for Rigetti. (Compl. ¶ 25). A transfer agent is a financial institution retained by a corporation like Rigetti to keep a record of who owns the company's stock. (*Id.* ¶ 21). Transfer agents are required to maintain accurate securityholder files and record detailed information about the transfer of any security. (*Id.* ¶ 23 (citing 17 C.F.R. § 240.17Ad-9(a), 10)). As relevant here, transfer agents hold certificates for restricted securities, which are stamped with a "restrictive" legend indicating that the securities may not be transferred to a brokerage account or resold in the market, and only a transfer agent can remove the restrictive legends from securities so that they can be transferred or sold by the shareholder. (*Id.* ¶ 18).

The Transfer Agency Agreement also authorized Defendant "to establish a program … through which a holder of one or more Shares (each, a 'Shareholder') may elect to sell any Shares held in book-entry form through the Direct Registration System ['DRS']." (Compl. ¶ 27 (emphasis omitted) (quoting *id.*, Ex. B at 1)). The Agreement further required Defendant to provide a number of services directly to Shareholders. (*Id.* ¶¶ 28-32). And through the Agreement, Defendant agreed that it would "perform the Services in a professional and workmanlike manner in accordance with generally accepted

industry standards for the industry in which the Services are being rendered." (*Id.* ¶ 33 (quoting *id.*, Ex. B at 3)).

### 3. Plaintiff and Mr. Reid Open Brokerage Accounts, and Mr. Reid Sells His PIPE Shares

In May 2022, Plaintiff and Mr. Reid opened brokerage accounts at Piper Sandler so that Piper Sandler could manage their Rigetti stock. (Compl. ¶ 34). At all times, Piper Sandler acted as the agent for Plaintiff and Mr. Reid in communications with Defendant on their behalf. (*Id.*).

On May 25, 2022, Jay Hershey, a managing director at Piper Sandler, connected Mr. Reid with a representative of Defendant who provided Mr. Reid with a statement confirming that Mr. Reid personally held 136,250 Rigetti shares in book-entry form at Defendant. (Compl. ¶ 35).

On June 2, 2022, Rigetti's counsel, Cooley LLP, sent Defendant an opinion letter regarding all the shares Rigetti had issued in its PIPE offering (the "June Cooley Letter"). (Compl. ¶ 36). Cooley advised that Rigetti's Registration Statement had become effective and further instructed Defendant that it was authorized to transfer "the Shares (or any portion thereof) held by a Selling Shareholder as set forth on Exhibit A" to the June Cooley Letter. (*Id.* (emphasis omitted)). Exhibit A reflected Mr. Reid's personal ownership of 136,250 PIPE Shares. (*Id.*). That same day, June 2, 2022, Piper Sandler began selling Mr. Reid's PIPE Shares, eventually selling all 136,250 by August 4, 2022. (*Id.* ¶ 38).

### 4. The SEC Restrictions on the Founder Shares Lift, and Plaintiff Sells Some Founder Shares

The SEC Restrictions on Plaintiff's Founder Shares were set to lift on September 3, 2022 — although the Issuer Restrictions would remain as to a subset of the shares. (*See* Compl. ¶ 39). In advance of September 3, 2022, counsel for the Supernova SPAC, Latham & Watkins, LLP, advised Mr. Reid that Cooley (Rigetti's counsel) would file a prospectus supplement to the Registration Statement that would allow him to sell Plaintiff's Founder Shares through a multistep process. (*Id.* ¶ 40; *see also id.*, Ex. A (the "Prospectus Supplement")).

As the first step in that process, Piper Sandler had to execute a sale of Plaintiff's Founder Shares. (*See* Compl. ¶¶ 37, 40, 44). Piper Sandler would then deliver to Defendant a "signed representation letter" reflecting the number of shares sold. (*Id.* ¶ 37). Upon receipt of a representation letter, Defendant would remove the relevant restrictions on the shares, which permitted Plaintiff to proceed with a DRS request to transfer those shares into its brokerage account. (*See id.*). After receiving the shares from Defendant, Piper Sandler would settle the trade and deliver the shares to the buyer. (*Id.*).

On August 18, 2022, Cooley filed the Prospectus Supplement with the SEC. (Compl. ¶ 41). The Prospectus Supplement reflected that Plaintiff owned 2,293,905 Founder Shares and included a footnote explaining that 833,652 of those shares remained subject to the Issuer Restrictions. (*Id.* (citing *id.*, Ex. A at 4-5 (detailing 675,528 shares that would become sellable only when the

stock price hit $12.50, and 158,124 shares that would become sellable only when the stock price hit $15.00))). Thereafter, Defendant issued a statement reflecting that Plaintiff held a total of 2,293,905 shares and cautioning that "[a] portion or all of the shares ... are subject to either an Issuer [R]estriction or a regulatory restriction under the Securities Act of 1933 and cannot be transferred without the approval of the Issuer or Legal Counsel for the Issuer." (*Id.* ¶ 42 (quoting *id.*, Ex. D)). This statement, Plaintiff alleges, demonstrated that Defendant was "fully aware that some of [Plaintiff]'s shares could not be transferred without the approval of Rigetti or its counsel." (*Id.*).

On August 31, 2022, Cooley emailed Mr. Reid and other Rigetti "Selling Securityholders" to inform them that the SEC Restrictions would expire on September 3, 2022, meaning that some Rigetti shares would become available for sale. (*See* Compl. ¶ 43). But Cooley's email also referenced the Issuer Restrictions, stating, "Securities received in the Sponsor Distribution that are subject to vesting will not be available for sale." (*Id.* (emphasis omitted) (quoting *id.*, Ex. E)).

On September 2, 2022, Cooley sent Defendant a second opinion letter (the "September Cooley Letter"). (Compl. ¶ 44). The September Cooley Letter explained that all of Rigetti's securities (common stock and warrants) were "eligible for legend removal pursuant to the conditions outlined below for the selling securityholders listed on Exhibit A attached hereto." (*Id.* (emphasis omitted) (quoting *id.*, Ex. F)). Those "conditions outlined below" included the following:

> [Y]ou [Defendant] are hereby *authorized … to transfer from time to time the Securities (or any portion thereof) held by a Selling Securityholder as set forth on Exhibit A* provided that you have received a completed and signed representation letter from the broker for such Selling Shareholder requesting that such transfer be made and certifying that (i) such Securities have been sold to a bona fide purchaser in accordance with the Registration Statement and (ii) such broker for the Selling Securityholder has delivered a current prospectus in connection with such sale.

(*Id.* (bolding and underlining omitted) (quoting *id.*, Ex. F)). Exhibit A to the September Cooley Letter reflected Plaintiff's ownership of 1,460,253 of the Founder Shares. (*Id.*). Plaintiff emphasizes in its Complaint that the September Cooley Letter and Exhibit A "do not refer in any way to [Plaintiff]'s shares that remained subject to [I]ssuer [R]estrictions until [Rigetti] hit certain price targets." (*Id.*). In other words, while the 1,460,253 Founder Shares were sellable, Defendant "was not authorized — by either Rigetti or Cooley — to transfer any of the 833,652 that remained subject to such restrictions." (*Id.*).

Between September and October 2022, Piper Sandler sold 555,903 of Plaintiff's Founder Shares from the group of 1,460,253 Founder Shares not subject to the Issuer Restrictions. (Compl. ¶ 45 (listing five sales transactions of varying volumes)). Those sales left 904,350 unrestricted Founder Shares (*id.*), and, combined with the 833,652 shares subject to the Issuer Restrictions, 1,738,002 total Founder Shares in Plaintiff's name. Defendant knew the precise number of shares sold by Plaintiff because Piper Sandler provided Defendant with a signed representation letter concerning each sale, and only

upon receipt of such letter did Defendant transfer the shares to Plaintiff's account at Piper Sandler. (*Id.* ¶ 46).

**5. The Miscommunications Begin**

One year after the Registration Statement became effective, the remaining shares that Plaintiff held that were not subject to the Issuer Restrictions could be transferred to its brokerage account. (Compl. ¶ 47). Conversely, any shares still subject to the Issuer Restrictions could not be transferred. (*Id.*).

On June 5, 2023, Alex Johnson, a Piper Sandler employee, reported to Mr. Reid that Defendant had confirmed that Cooley had issued a "blanket opinion" letter and that Mr. Reid's "common [Rigetti] shares will be unrestricted in the next few business days." (Compl. ¶ 48 (quoting *id.*, Ex. G)). The Complaint alleges that Defendant's reference to the blanket opinion letter was to the September Cooley Letter reflecting Plaintiff's holding of the 1,460,253 Founder Shares that Defendant was authorized to transfer to Plaintiff (because the SEC Restrictions had lifted and the Issuer Restrictions did not apply). (*Id.*). In other words, the "blanket opinion" letter did not refer to the 833,652 shares subject to the Issuer Restrictions or to the 2,293,905 total Founder Shares, just the 1,460,253 unrestricted Founder Shares.

On June 7, 2023, Mr. Johnson advised Mr. Reid that Defendant had requested certain documentation "in order to fully remove the [restrictive] legends on the [Rigetti] shares held there." (Compl. ¶ 49 (first alteration in original) (quoting *id.*, Ex. H); *id.*, Ex. H at 2). In consequence, he instructed Mr.

Reid to sign a "Legend Removal Letter" and email it to Defendant. (*Id.* ¶ 49). To that end, Mr. Johnson sent Mr. Reid an unsigned Legend Removal Letter drafted by Piper Sandler that stated:

> I am writing to instruct you to remove the restricted legends on 1,738,002 shares of Rigetti Computing, Inc (RGTI) held by [Plaintiff] in [Defendant] account number x0452 in conjunction with the blanket legal opinion on file.
>
> Upon restricted legend removal we wish to have the shares transferred via DRS to our brokerage account at Piper Sandler & Co[.]

(*Id.* (alterations adopted) (quoting *id.*, Ex. H)). Mr. Johnson also provided specific language for Mr. Reid's cover email to Defendant:

> Attached you will find a legend removal letter for 1,738,002 shares of Rigetti Computing, Inc held by [Plaintiff] in [Defendant] Account Number x0452. We understand that there is a blanket opinion on file to have the restricted legends removed upon our request.
>
> I, Robert Reid, as an authorized member of [Plaintiff], wish to have the restricted legends removed on my shares such that we may transfer them to our brokerage account via DRS transfer.

(*Id.* (alteration adopted) (quoting *id.*, Ex. H)). Mr. Reid made no changes to the Legend Removal Letter drafted by Piper Sandler. (*Id.* ¶ 50). He simply printed it, signed it, and emailed it to Defendant on June 8, 2023, using the exact language in the body of his email that Piper Sandler had drafted for him. (*Id.*; *id.*, Ex. I).

At the time, Mr. Reid was not cognizant of the specific number of Rigetti shares held by Plaintiff. (Compl. ¶ 51). Rather, he understood that he initially

held approximately 27% of the Rigetti Founder Shares, while his other partners held the remaining 73%. (*Id.*).

This set of communications on June 7 and 8, 2023, is where the mistakes began. The total number of Founder Shares Plaintiff still owned was 1,738,002 — but this number included both unrestricted shares (904,350 after the September to October 2022 sales) and shares still subject to the Issuer Restrictions (833,652). In other words, the correct number of shares eligible for transfer was not 1,738,002, but instead 904,350.

### 6. The Miscommunications Compound, and Despite Confusion Among Defendant's Staff, Defendant Removes the Restrictive Legends from All 1,738,002 Remaining Founder Shares

Unsurprisingly, Mr. Reid's Legend Removal Letter spurred confusion at Defendant. The letter prompted Defendant to search for verification of the number of Founder Shares eligible for transfer. It found none but nevertheless eventually transferred all 1,738,002 Founder Shares anyway.

According to Plaintiff, events unfolded as follows: At first, Defendant did not respond to Mr. Reid's Legend Removal Letter. (Compl. ¶ 52). Mr. Johnson followed up on June 21, 2023, copying Mr. Reid on his email to Defendant. (*Id.*). Marie Cecile Cezaire, a Restricted Processing Specialist at Defendant, responded, asking Mr. Johnson for a copy of the documents that Mr. Reid had previously sent. (*Id.*). Mr. Johnson re-sent Ms. Cezaire the documents and asked whether Defendant needed anything else in order to process the legend removal request. (*Id.*). Ms. Cezaire asked Mr. Johnson for a copy of the

"opinion." (*Id.* (internal quotation marks omitted) (quoting *id.*, Ex. J)). Mr. Johnson responded to Ms. Cezaire:

> We do not have a copy of the opinion. [Defendant] confirmed they had the blanket opinion on file — do you need me to reach out to our contacts at [Rigetti] for a copy of the opinion or is this something you can obtain directly with them?

(*Id.* (quoting *id.*, Ex. J)). Mr. Reid was copied on these emails. (*Id.*, Ex. J; *see id.* ¶ 52).

Hearing nothing for two days, Mr. Johnson followed up with Ms. Cezaire on June 23, 2023, reiterating his question whether Defendant "need[ed] us to obtain a copy of the blanket opinion from the company," and stating that "[w]e were told by reps at [Defendant] that the blanket opinion was on file." (Compl. ¶ 53; *id.*, Ex. J). Minutes later, a different employee of Defendant, Sonia Wyllie, responded to Mr. Reid and Mr. Johnson, stating, "We do not have a current blanket opinion on file and you would need to contact the Company or their counsel." (*Id.* ¶ 53; *id.*, Ex. J). Ms. Wyllie also apologized for the "incorrect information" Defendant previously provided about having the blanket opinion on file. (*Id.* ¶ 53 (quoting *id.*, Ex. J)).

Mr. Johnson and Mr. Reid had no further written communications with Defendant until the morning of June 26, 2023, when Ms. Cezaire replied to Ms. Wyllie's email, advising both Mr. Reid and Mr. Johnson that "[t]he shares are now *free and clear*." (Compl. ¶ 54 (bolding omitted) (quoting *id.*, Ex. J)). Like Mr. Reid's erroneous request for 1,738,002 Founder Shares, this free-and-clear advisement is another critical communication at the heart of this

case. Following the free-and-clear advisement, on June 27, 2023, Defendant — who as Rigetti's transfer agent was the only entity able to remove the restrictive legends on Plaintiff's shares and transfer them to Plaintiff's brokerage accounts — transferred 1,738,002 Founder Shares to Plaintiff's brokerage accounts at Piper Sandler. (*Id.* ¶¶ 56-57, 65).

But of course, not all of those shares were in fact free and clear. (Compl. ¶ 58). Defendant transferred 833,652 shares too many— which were all still subject to the Issuer Restrictions — thereby causing Plaintiff its $10.8 million loss. (*See id.* ¶¶ 72-74). That is, in Plaintiff's telling of events, the September Cooley Letter specified to Defendant that Plaintiff owned 1,460,253 unrestricted Founder Shares and authorized Defendant to transfer only those unrestricted shares, and not the remaining 833,652 shares still subject to the Issuer Restrictions. (*Id.* ¶ 58). Following Plaintiff's September to October 2022 sale of 555,903 unrestricted Founder Shares, the pool of Plaintiff's 1,460,253 unrestricted Founder Shares had been reduced to 904,350 (*id.* ¶ 45), and separately Plaintiff still owned the 833,652 shares subject to the Issuer Restrictions (*see id.* ¶¶ 59 & n.4, 60 & n.5), for a total of 1,738,002 Founder Shares. Because Plaintiff had only 904,350 unrestricted Founder Shares remaining, Defendant was only permitted to transfer 904,350 Founder Shares. (*Id.* ¶ 60 & n.5). By instead improperly transferring all 1,738,002 Founder Shares — as Mr. Reid had erroneously requested in his Legend Removal Letter — Defendant transferred 833,652 more shares than it was supposed to. (*See id.* ¶¶ 59 & n.4, 60 & n.5). Put differently, Defendant transferred the

entirety of Plaintiff's shares still subject to the Issuer Restrictions, when it could in fact transfer none. What is more, the September Cooley Letter only permitted Defendant to transfer 1,460,253 Founder Shares in the first place — not the 1,738,002 Defendant in fact transferred. (*See id.* ¶ 59 & n.4).

**7. Unaware That Plaintiff No Longer Had Any Founder Shares Remaining with Defendant, Mr. Reid Sells or Donates All of Plaintiff's Rigetti Shares**

The critical question in this case is how the mistaken transfer occurred. Plaintiff alleges that it was due to Defendant's failure to properly review and comply with the September Cooley Letter. (Compl. ¶ 63). Mr. Reid, for his part, believed that when Defendant transferred Plaintiff's 1,738,002 Founder Shares to Piper Sandler, the Founder Shares still subject to the Issuer Restrictions remained with Defendant for safekeeping. (*Id.* ¶ 65). Unaware that, in reality, all the Founder Shares were at Piper Sandler and Defendant no longer held any, Mr. Reid thought he would be able to sell the restricted shares later when the stock price met the $12.50 or $15.00 thresholds and the Issuer Restrictions lifted. (*See id.*). So, relying on Defendant's incorrect free-and-clear advisement and subsequent transfer, between September 14, 2023, and January 30, 2024, Mr. Reid offloaded all the Founder Shares in two ways. (*Id.* ¶¶ 66-67). *First*, he sold 923,307 shares at an average price of $1.22 — far below the $12.50 or $15.00 thresholds. (*Id.* ¶ 66). *Second*, he directed the remaining 814,695 shares to philanthropic organizations, donating 200,000 shares to the University of North Carolina at Chapel Hill and 614,695 to the Robert Reid Family Foundation, a donor-advised fund that supports multiple

charitable causes. (*Id.* ¶ 67). At the end of this process, by January 30, 2024, Plaintiff owned no more shares in Rigetti. (*Id.* ¶¶ 66-67).

**8. Plaintiff Discovers the Mistake**

Plaintiff discovered the mistake when certain Issuer Restrictions lifted. On February 6, 2025, Rigetti shares reached the threshold price of $12.50 for 20 out of the previous 30 days. (Compl. ¶ 68). Rigetti advised Defendant that the restrictive legends on that first tranche of shares could be removed. (*Id.*). Mr. Johnson asked Rigetti for a statement from Defendant reflecting Plaintiff's holdings so that Piper Sandler could begin preparing the necessary paperwork to have the shares transferred to Plaintiff's account at Piper Sandler. (*Id.*). But neither Rigetti nor Defendant could find any record of any shares still held in Plaintiff's name. (*Id.*).

By the following day, it became clear that Defendant did not have custody of any Rigetti shares in Plaintiff's name. (Compl. ¶ 69). Mr. Reid was "shocked." (*Id.*). He asked Piper Sandler for an explanation, and Mr. Hershey responded:

> It seems to us that the Transfer Agent released your shares early and you sold/gifted the shares. We don't know about the Transfer Agent's decision to release shares if they were subject to the $12.50 earnout early. The latter is 100% on the Transfer Agent if that was the case.

(*Id.* (emphases omitted) (quoting *id.*, Ex. K)). Thus, while some of Mr. Reid's Supernova SPAC partners were now able to sell their Rigetti shares for many

millions of dollars, because of Defendant's false free-and-clear advisement and concomitant improper transfer, Plaintiff was not so able and lost out on $10.8 million. (*Id.* ¶¶ 70-75).

**B. Procedural Background**

Plaintiff sued Defendant in this Court on September 12, 2025, alleging gross negligence (Count I), negligence (Count II), negligent misrepresentation (Count III), professional negligence (Count IV), and breach of contract (Count V). (Compl.). Defendant moved to dismiss the Complaint on January 23, 2026. (Dkt. #16-20). Plaintiff submitted its opposition on February 27, 2026. (Dkt. #24). Defendant replied on March 18, 2026. (Dkt. #25).

**DISCUSSION**

**A. Applicable Law**

Defendant seeks dismissal of Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. When considering such a motion, a court "draw[s] all reasonable inferences in [a plaintiff's] favor, assume[s] all well-pleaded factual allegations to be true, and determine[s] whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009). A plaintiff is entitled to relief if it alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). Nevertheless, the court is "not bound to accept conclusory allegations or legal

conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Smith* v. *Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)). Indeed, a plaintiff must do more than provide a "formulaic recitation of the elements of a cause of action" — that is, its "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Additionally, "[i]n considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see generally United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).

**B. Analysis**

**1. Defendant's Threshold Causation Argument Is Unavailing**

At the outset, Defendant advances an argument that it believes bars some or all of Plaintiff's claims — that Plaintiff's own willful actions (through Mr. Reid), not Defendant's, were the cause of Plaintiff's $10.8 million loss. (Def. Br. 13-16).[2] Under New York law,[3] for Plaintiff to establish a *prima facie*

---

2 The Court understands this argument to be presented in two variations, first as a proffered intervening cause and second as an equitable defense of *in pari delicto*. The Court addresses the first variation in this section and the second one *infra*.

3 The parties assume that New York law governs this case. (*See* Def. Br. 13-15 (citing New York state cases for its threshold arguments); *id.* at 17 n.13 (citing a New York

case of negligence, it must show that Defendant's negligence was "a substantial cause of the events which produced the injury." *Boltax* v. *Joy Day Camp*, 67 N.Y.2d 617, 619 (1986) (internal quotation marks and citation omitted). And "[w]hen an intervening act also contributes to the plaintiff's injuries, liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence." *Id.* (internal quotation marks and citation omitted). Invoking these principles, Defendant argues that Mr. Reid's "affirmative, intentional[,] and knowing decision to sell [the Founder] [S]hares was the cause of any alleged harm [Plaintiff] purportedly suffered." (Def. Br. 13 (emphasis omitted)). Even if Defendant "furnished the occasion" for Plaintiff's injury, Defendant asserts, Plaintiff's "intervening act" — the knowing or reckless decision to sell the Founder Shares — directly caused the loss and thus "absolve[s]" Defendant of liability. (*Id.* at 14). The Court disagrees.

---

state case for elements of negligence and progressional negligence claims); *id.* at 18-19 (citing both New York and Delaware state cases for negligent misrepresentation claim, but ultimately discussing how New York courts treat such claims); *id.* at 20 (citing a Southern District of New York case, which ultimately relies upon a New York state case, for gross negligence claim); *id.* at 20 n.14 ("New York law applies to the contract claim[ ]."); Pl. Opp. 10 n.3 ("New York law governs Plaintiff's tort claims[.]"); *id.* at 23-24 (applying New York state law for breach of contract claim); *see also* Def. Br. 16 n.11 (arguing that "Delaware's version of the Uniform Commercial Code applies"); Pl. Opp. 17 n.4 (arguing that because "[b]oth New York and Delaware have adopted the UCC[ ], and the provisions at issue here … are identical[,] … the question of applicable law with respect to the UCC is therefore academic" (alteration adopted) (internal quotation marks and citations omitted))). The Court agrees that New York law applies to all of Plaintiff's claims. *See Sackin* v. *TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 747 n.1 (S.D.N.Y. 2017) ("The parties' briefs assume that New York state law governs this case, and such implied consent is sufficient to establish the applicable choice of law." (alterations adopted and internal quotation marks omitted) (quoting *Trikona Advisers Ltd.* v. *Chugh*, 846 F.3d 22, 31 (2d Cir. 2017))); *Liberty Mut. Ins. Corp.* v. *N.Y. Marine & Gen. Ins. Co.*, 505 F. Supp. 3d 260, 269 n.4 (S.D.N.Y. 2020) ("The Court applies New York law because the parties' briefing assumes New York law applies.").

As pleaded in the Complaint, Plaintiff's sale of the Founder Shares was a normal and foreseeable consequence of Defendant's mistaken transfer, such that this intervening act does not insulate Defendant from liability. It is reasonable to infer from the Complaint that Defendant, as Rigetti's transfer agent, knew that shareholders request removal of restrictive legends and transfers of securities to their brokerage accounts so that they can sell the shares. (*See* Compl. ¶ 18 ("Only a transfer agent can remove the restrictive legends from securities so that they can be transferred or sold by the shareholder.")). Indeed, that was exactly what happened when Mr. Reid previously requested a transfer of his PIPE Shares; he sold them all. (*Id.* ¶ 38).

The Complaint therefore plausibly alleges that Defendant knew that Plaintiff's sale (or donation) of the Founder Shares was not only a reasonably foreseeable consequence of Defendant's transfer, but in fact a highly likely outcome. Mr. Reid's offloading of the Founder Shares on the market and to charitable causes therefore does not absolve Defendant of liability. *See Kush* v. *City of Buffalo*, 59 N.Y.2d 26, 33 (1983) ("An intervening act will be deemed a superseding cause and will serve to relieve defendant of liability when the act is of such an *extraordinary nature* or *so attenuates* defendant's negligence from the ultimate injury that responsibility for the injury may not be reasonably attributed to the defendant." (emphases added) (collecting cases)).

### 2. Plaintiff Has Stated Claims for Negligence (Count II) and Professional Negligence (Count IV)

The Court now turns to Defendant's specific challenges to Plaintiff's individual claims and begins with Counts II and IV. To state a claim for negligence or professional negligence under New York law, Plaintiff must allege that (i) Defendant owed it a duty, (ii) Defendant breached that duty, and (iii) Plaintiff suffered an injury substantially caused by the breach. *Lombard* v. *Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002) (citing *Merino* v. *N.Y.C. Transit Auth.*, 639 N.Y.S.2d 784, 787 (1st Dep't 1996)); *Pension Comm. of Univ. of Montreal Pension Plan* v. *Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608, 625 (S.D.N.Y. 2009) ("Under New York law, professional malpractice is a species of negligence. To prevail on a professional malpractice claim, a plaintiff must demonstrate the elements of negligence, and the breach of duty must be by a professional in a departure from accepted standards of practice." (alterations adopted) (internal quotation marks and citations omitted)).

#### a. Defendant Owed Plaintiff a Common-Law Duty of Care

To attack Count II, Defendant first argues that it owed Plaintiff no duty because "under common law, transfer agents do not owe affirmative duties to shareholders." (Def. Br. 16). But Defendant misstates the law. It may be true that a transfer agent does not owe a shareholder a duty when it refuses to make a transfer. But when a transfer agent does in fact make the transfer, it owes the shareholder a duty. The distinction is between "nonfeasance" and "misfeasance." *Campbell* v. *Liberty Transfer Co.*, No. 02 Civ. 3084 (DRH), 2006 WL 3751529, at *17 (E.D.N.Y. Dec. 19, 2006) (explaining that nonfeasance is

the "total omission or failure" of an agent to perform a duty he has agreed to do, while misfeasance is "the improper doing of an act which the agent might lawfully do" (internal quotation marks omitted) (quoting *Black's Law Dictionary* 1054 (6th ed. 1990))). Nonfeasance "is arguably non-actionable under a ... common law theory of negligence." *Id.* But misfeasance — like the "mistake[n]" "issuance of [a] share certificate ... absent the required restrictive legend" — "entail[s] the actual performance of a recognized duty, [*i.e.*,] the issuance of stock, but in a negligent manner with resulting harm to a third party" and is therefore "a recognized basis for a lawsuit by a shareholder against a transfer agent." *Id.*

A review of the law on this precise issue — whether a transfer agent owes a shareholder a duty to not negligently transfer a restricted stock — does not yield many additional cases directly on point. That is no surprise, given that the parties themselves are hardly able to cite any New York cases addressing the issue. (*See* Def. Br. 16 (collecting six cases, only one of which comes from New York, *Nicholson* v. *Morgan*, 196 N.Y.S. 147 (N.Y. Mun. Ct. 1922)); Pl. Opp. 15-17 (relying almost entirely on *Campbell*, 2006 WL 3751529)). The Court has located two New York Supreme Court cases that discuss the duty question, albeit by engaging with *Campbell*. Both suggest that Defendant owed Plaintiff a common-law duty here.

*First*, in *Magna Equities II, LLC* v. *Writ Media Group Inc.*, Index No. 653808/2016, 2017 WL 1232524 (N.Y. Sup. Ct. Mar. 30, 2017), the court acknowledged with approval the nonfeasance-misfeasance distinction drawn in

*Campbell*. *Id.* at *7-8. In *Magna Equities*, however, the plaintiffs' claim was "based on [the defendant]'s nonfeasance" — its "alleged failure to transfer shares ... to plaintiffs" — so the court, consistent with the principles articulated in *Campbell*, dismissed the plaintiffs' negligence claim as a matter of law. *Id.* at *8. Of note, the court did not challenge *Campbell*'s reading of the nonfeasance-misfeasance distinction. *See id.* Indeed, the court acknowledged that the plaintiffs' claim was "not based on misfeasance, which is a duty performed badly," and implied that such a misfeasance theory would state a claim. *See id.* Further, the court included a block quote from *Campbell* and did not challenge its correctness, but rather used it as a foundation for its analysis. In these ways, the *Magna Equities* court signaled that a claim for misfeasance in which a transfer agent "issu[ed] [a] stock, but in a negligent manner with resulting harm to a third party" would survive. *Id.* (internal quotation marks omitted) (quoting *Campbell*, 2006 WL 3751529, at *17).

*Second*, there is *Popo* v. *Equity Stock Transfer, LLC*, Index No. 653624/2023, 2025 WL 1735646 (N.Y. Sup. Ct. June 16, 2025), which, like *Magna Equities*, is informative by inference. In *Popo*, the court dismissed the plaintiff's negligence claim against a transfer agent for two reasons, both of which support the conclusion that Defendant in the instant case owed Plaintiff a duty. To begin, the *Popo* court held that the transfer agent could not have owed the plaintiff a fiduciary duty "since corporations themselves do not owe fiduciary duties to members or shareholders." *Id.* at *2. In so holding, the court distinguished "the duty at issue in *Campbell* — between the transfer

agent and the third-party —" from a fiduciary duty and further explained that "*Campbell* does not cast doubt" on the rule "that a fiduciary duty does not run between corporations and their shareholders." *Id.* at *3 n.2. By harmonizing *Campbell* rather than calling it into question, the *Popo* court thus implicitly endorsed *Campbell*'s misfeasance analysis, *i.e.*, that a transfer agent owes a shareholder the common-law duty not to issue stock negligently. Further, the court held that the transfer agent could not have owed the plaintiff a duty of care because, "in contrast [to *Campbell*], ... plaintiff [did] not allege that [the transfer agent] failed to comply with [i] applicable securities regulations, [ii] [the issuer's] Offering Circular," which "outline[d] the process by which investors receive[d] their shares" after "request[ing] a transfer," "or [iii] any other duty [in] completing the stock transfer." *Id.* at *1-2. By distinguishing *Campbell* in this second way, the court implied that if a transfer agent violated stock transfer restrictions (whether imposed by the SEC or the issuer), that would constitute a breach of its duty of care and support a claim for negligence.

Accordingly, though the law is underdeveloped on this issue, it points to the conclusion that Defendant, as a transfer agent, owed Plaintiff, as a shareholder, a common-law duty of care to not negligently transfer restricted stock. Indeed, despite its collection of six cases ostensibly to the contrary, the lone New York case Defendant cites merely articulates the nonfeasance principle: "The stock transfer agent owes no affirmative duty to a stockholder, and incurs no personal liability by refusing to make a transfer at the request of

the latter." *Nicholson*, 196 N.Y.S. at 151. Because Plaintiff's negligence claim is premised on a misfeasance theory, Defendant's cases are inapposite.

#### b. Defendant Did Not Owe Plaintiff a Statutory Duty Under the Uniform Commercial Code

Proceeding from the assumption that it owed Plaintiff no duty under common law, Defendant devotes more space in its briefing to arguing that it did not owe Plaintiff a duty under Article 8 of the Uniform Commercial Code (the "UCC"). (Def. Br. 16-17). Ultimately, the Court agrees with Defendant that the UCC does not impose upon it a duty to refuse to transfer restricted stock, so although Counts II and IV survive, Plaintiff may only argue duty under a common-law theory moving forward.

The parties agree that the relevant UCC provisions are Sections 8-401 and 8-407. (*See* Def. Br. 16-17; Pl. Opp. 17 n.4).[4] Section 8-401 imposes a duty to transfer securities if seven preconditions are satisfied. N.Y. U.C.C. § 8-401; *see also Campbell*, 2006 WL 3751529, at *7-8. This duty inheres in the issuer in the first instance, N.Y. U.C.C. § 8-401, but Section 8-407 imposes the duty on the transfer agent as well, *id.* § 8-407 ("A person acting as ... transfer agent ... in the issue of new security certificates or uncertificated securities ... has the same obligation to the holder or owner of a certificated or uncertificated security with regard to the particular functions performed as the issuer has in

4 The Court will use New York's UCC. Defendant asserts that Delaware's UCC applies (Def. Br. 16 n.11), but because New York and Delaware have both adopted the UCC, and each state's versions of Sections 8-401 and 8-407 are substantively identical, "the question of applicable law is therefore academic." *Smouha* v. *MTA & J.P. Morgan Chase*, 797 N.Y.S.2d 278, 284 (N.Y. Sup. Ct. 2005). (*See also* Pl. Opp. 17 n.4 (advancing this point)).

regard to those functions.”). The parties therefore agree that Section 8-401 binds Defendant, but they disagree as to whether it imposed a duty in this case.

A careful review of Section 8-401 demonstrates that it does not impose a duty on Defendant. When a securityholder instructs an issuer to transfer its securities, Section 8-401 imposes on the issuer (and, sometimes, the transfer agent) the duty to “register the transfer as requested if,” among other things, “the transfer does not violate any restriction on transfer imposed by the issuer,” and “the transfer is in fact rightful.” N.Y. U.C.C. § 8-401(a)(5), (7). In other words, if Plaintiff had requested that Defendant transfer Founder Shares that were genuinely free and clear, Defendant would have a statutory duty under the UCC to do so. Flipping the statute on its head, Plaintiff argues that the UCC imposes an inverse duty to not transfer shares that are not free and clear — that is, Plaintiff believes that Defendant owed it a duty to not transfer the restricted Founder Shares. (Pl. Opp. 17-18). But this inverse duty does not find support in the language of the statute.

The Court begins by acknowledging the dearth of case law addressing this question. The parties cite no cases analyzing whether Section 8-401 imposes an inverse duty to not transfer shares when its preconditions are not satisfied (Def. Br. 16-17; Pl. Opp. 17-18), and the Court has not identified any relevant cases either. The text of the statute thus controls, as it always does in the first instance. *Tudor* v. *Whitehall Cent. Sch. Dist.*, 132 F.4th 242, 246 (2d

Cir. 2025) ("When interpreting a statutory provision, we start with the text." (internal quotation marks and citation omitted)).

As a matter of first principles, then, the question is whether a statute creating a duty to take an action when certain preconditions are met also creates the inverse duty to not take that action when the preconditions are not met. Applying the interpretive canon known as *expressio unius est exclusio alterius* leads the Court to conclude that the answer is no; Section 8-401 did not impose on Defendant a duty to not transfer the restricted Founder Shares. *Expressio unius est exclusio alterius* means "that the inclusion of a particular thing in a statute implies an intent to exclude other things not included." *Cruz* v. *TD Bank, N.A.*, 22 N.Y.3d 61, 72 (2013). So "where a law expressly describes a particular act, thing or person to which it shall apply, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded." *Colon* v. *Martin*, 35 N.Y.3d 75, 78 (2020). This canon ordinarily applies in a slightly different context — when determining that the enumeration of one item of an associated group or series excludes another left unmentioned, *N.L.R.B.* v. *SW Gen., Inc.*, 580 U.S. 288, 302 (2017) — but it is nonetheless helpful in interpreting Section 8-401. That is because *expressio unius* "is typically used to limit the expansion of a right or exception — not as a basis for recognizing unexpressed rights by negative implication," *Cruz*, 22 N.Y.3d at 72.

The New York Court of Appeals rejected an analogous inverse construction in *Cruz*, concluding that a statute that provided that banks were

*not liable* when they *inadvertently* failed to send certain notices to judgment debtors did not, by negative implication, mean banks *were liable* for any *non-*inadvertent failure. 22 N.Y.3d at 65-66, 69, 72. That logic applies with equal force here: While Section 8-401 says that issuers have a duty to transfer shares that are free and clear, it does not, by negative implication, mean that issuers have a duty to not transfer shares that are not free and clear. *Cf. People* v. *Borgstrom*, 178 N.Y. 254, 258 (1904) ("Certainly, no such duty [of a court to advise a prisoner of his right to challenge a grand juror] can be assumed in the absence of positive statutory provision.").

Resisting this conclusion, Plaintiff warns of absurd results. (Pl. Opp. 17-18). Taken to its logical end, Plaintiff muses, the notion that Defendant owes no duty to not transfer restricted shares would mean that Defendant would incur no liability for transferring any number of shares to Plaintiff, even all 15 million or so Rigetti shares in existence. (*Id.*). But just because Defendant owes no statutory duty under the UCC to Plaintiff for such an improper action does not mean it owes *no* party a duty and would be immune from liability. Liability to Rigetti as the issuer, or to the SEC as the regulator, would surely result. (*See* Def. Reply 3 n.4). Indeed, Defendant's common-law duty of care to Plaintiff also guards against this behavior.

Accordingly, Count II states a claim for negligence, but only because Defendant owed Plaintiff a common-law duty and not a statutory one under the UCC. Relatedly, because Defendant argues that Count IV has "essentially the same elements" as Count II and further argues that those claims rise and fall

together (Def. Br. 17 n.13), the Court holds that Count IV states a claim for professional negligence as well.

**3. Plaintiff Has Stated a Claim for Negligent Misrepresentation (Count III)**

Count III alleges negligent misrepresentation, premised on Defendant's false statement that all of Plaintiff's 1,738,001 Founder Shares were "free and clear." (Compl. ¶¶ 87-92). As previously discussed, 833,652 of those shares were not free and clear because they were still subject to the Issuer Restrictions. Plaintiff alleges that Defendant knew Plaintiff would rely on its misrepresentation to the contrary and further alleges that Plaintiff did in fact so rely when it facilitated the transfer and eventual offloading of those shares. (*Id.* ¶¶ 90-92).

"To state a claim for negligent misrepresentation under New York law, the plaintiff must allege that [i] the defendant had a duty, as a result of a special relationship, to give correct information; [ii] the defendant made a false representation that he or she should have known was incorrect; [iii] the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; [iv] the plaintiff intended to rely and act upon it; and [v] the plaintiff reasonably relied on it to his or her detriment." *Anschutz Corp.* v. *Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012) (internal quotation marks and citation omitted). Defendant focuses its challenges to Count III on the duty element and briefly argues as a backstop that Plaintiff's reliance was not reasonable. (Def. Br. 18-20). But because the

Complaint plausibly alleges that Defendant owed Plaintiff a duty to give it correct information as a result of their special relationship and, further, that Plaintiff's reliance was reasonable, the Court holds that Count III states a claim for relief.

"Under the duty element, New York strictly limits negligent misrepresentation claims to situations involving actual privity of contract between the parties or a relationship so close as to approach that of privity." *Anschutz Corp.*, 690 F.3d at 114 (internal quotation marks and citation omitted); *see also Charles Schwab & Co.* v. *Retrophin, Inc.*, No. 14 Civ. 4294 (ER), 2015 WL 5729498, at *12 (S.D.N.Y. Sept. 30, 2015) ("To establish such a privity-like relationship under New York law, a plaintiff must plead: '[i] an awareness by the maker of the statement that it is to be used for a particular purpose; [ii] reliance by a known party on the statement in furtherance of that purpose; and [iii] some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance.'" (quoting *Prudential Ins. Co. of Am.* v. *Dewey, Ballantine, Bushby, Palmer & Wood*, 80 N.Y.2d 377, 384 (1992)))).

One way to establish a special relationship or privity is to show that Defendant owed Plaintiff a duty of care. *See Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003) (explaining that a negligent misrepresentation claim must allege that "the declarant is bound by some relation or duty of care" (citing *White* v. *Guarente*, 43 N.Y.2d 356, 363 (1977))). This route alone establishes the parties' special relationship; the Court has

already explained that the Complaint plausibly alleges that Defendant owed Plaintiff a common-law duty of care. To be clear, it matters not that Count II's duty of care to not negligently transfer restricted stock differs from Count III's duty to give correct information; the existence of the duty of care goes to the subsidiary question of the special relationship, not the overarching duty to give correct information. *See White*, 43 N.Y.2d at 363. And Plaintiff challenges the overarching duty to give correct information only by arguing that the parties did not have a special relationship. (Def. Br. 18-19).

But there are also other ways to establish a special relationship or privity. Another is to allege multiple "direct communications" between the parties that show the defendant's intent for the plaintiff to rely on its communications. *Anschutz Corp.*, 690 F.3d at 115. The Complaint does just that, detailing a series of back-and-forth communications, first about Mr. Reid's PIPE Shares and later about Plaintiff's Founder Shares. (Compl. ¶¶ 35, 38, 45-46, 48-55). Specifically, those communications concerned the amount of PIPE Shares Mr. Reid held with Defendant, Plaintiff's September to October 2022 sale of 555,903 Founder Shares, and the June 2023 transfer at the center of this case. (*Id.*). Those communications were directly between Plaintiff (through Mr. Reid) and Defendant, and the Complaint plausibly establishes that Plaintiff relied on Defendant's representations in them. For example, after Defendant told Mr. Reid how many PIPE Shares he owned, he later sold them all (*id.* ¶¶ 35, 38) — putting Defendant on notice, if it was not already, that Plaintiff and Mr. Reid would rely on its representations about their Rigetti

shares to make trading decisions. Thus, when Defendant gave Plaintiff its free-and-clear advisement, it was aware, or should have been aware, that Plaintiff would rely on that representation to subsequently offload its 1,738,002 Founder Shares. *See Charles Schwab & Co.*, 2015 WL 5729498, at *12. Indeed, as the Court explained above, that was not only reasonably foreseeable to Defendant but the most likely result. In sum, Defendant's arguments that Count III fails on the duty element are unavailing, both because Defendant owed Plaintiff a duty of care and because the parties' direct communications demonstrate a special or privity-like relationship.

Defendant also attacks Count III on the grounds that Plaintiff's reliance on its free-and-clear advisement was not reasonable. Specifically, Defendant argues that because Plaintiff was equally as sophisticated as Defendant, had the same special expertise, and could have learned from documents available to it precisely which Founder Shares remained restricted and why, its reliance on the free-and-clear advisement was not reasonable. (Def. Br. 19-20). New York law establishes that "[a]n affirmative misrepresentation does not give rise to liability if the true facts could have been ascertained by the plaintiffs 'by means available to them through the exercise of ordinary intelligence.'" *Vasquez* v. *Soto*, 877 N.Y.S.2d 467, 468 (2d Dep't 2009) (quoting *Esposito* v. *Saxon Home Realty, Inc.*, 679 N.Y.S.2d 152, 152 (2d Dep't 1998)); *see also KNK Enters., Inc.* v. *Harriman Enters., Inc.*, 824 N.Y.S.2d 307, 307 (2d Dep't 2006) ("A party cannot claim reliance on a misrepresentation when he or she could have discovered the truth with due diligence."). And "a party 'who signs or

accepts a written contract is conclusively presumed to know its contents and to assent to them.'" *Gold* v. *Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (alterations adopted) (quoting *Metzger* v. *Aetna Ins. Co.*, 227 N.Y. 411, 416 (1920)). Invoking these rules, Defendant contends that because Plaintiff had "full knowledge of the [I]ssuer [R]estrictions" by virtue of Mr. Reid's signing of certain documents and the public availability of others, its reliance was not reasonable. (Def. Br. 20 (emphasis omitted)). This argument is not without merit, but at this stage, drawing all reasonable inferences in Plaintiff's favor, it is unsuccessful.

The Complaint plausibly pleads that Plaintiff (through Mr. Reid) was entitled to rely on Defendant's expert advice. Although Plaintiff admits Mr. Reid's sophistication in the industry (*e.g.*, Pl. Opp. 21 ("Mr. Reid was an experienced SPAC investor")), that sophistication is not equivalent to Defendant's particular expertise, as a transfer agent, on the removal of restricted legends on securities. Moreover, Plaintiff did not have access to the September Cooley Letter, in which yet other experts advised Defendant of exactly which Founder Shares were unrestricted. (Compl. ¶ 44). That letter provided critical information to which Defendant had access but Plaintiff did not.

Undeterred, Defendant argues that this information was otherwise publicly available or existed in documents that Mr. Reid signed. But, at this stage, Plaintiff's allegations plausibly establish that Mr. Reid relied on other experts' superior understandings of the contours of the Issuer Restrictions.

(*See* Compl. ¶ 51 (alleging that "Mr. Reid was not cognizant of the specific number of Rigetti shares held by [Plaintiff]" and instead understood only the percentage of shares he held relative to his partners); *id.* ¶ 50 (alleging that "Mr. Reid made no changes to the [L]egend [R]emoval [L]etter drafted by Piper [Sandler]" and instead "simply printed it, signed it and emailed it to [Defendant]")). Further, none of the documents that Mr. Reid signed set forth the number of Founder Shares subject to the Issuer Restrictions; rather, they reveal only in broad terms that there were two tranches of shares subject to restrictions. (*See* Harmon Decl., Ex. B, C, E, F, G, H; Def. Br. 20 (arguing that these documents made the relevant information equally available to Plaintiff)). The only publicly available document establishing the precise breakdown of how many Founder Shares remained subject to the Issuer Restrictions was the August 18, 2022 Rigetti Prospectus Supplement, but Mr. Reid did not sign it, and for the reasons just explained, Plaintiff is entitled to the inference that he was not responsible for knowing the information contained in it. Plaintiff's reliance on Defendant's free-and-clear advisement was therefore reasonable.[5]

Accordingly, because the Complaint plausibly alleges that (i) Plaintiff and Defendant were in a special or privity-like relationship and (ii) Plaintiff (through

[5] Because the Complaint has plausibly alleged that Plaintiff and Mr. Reid did not have specialized expertise equivalent to Defendant that would render their reliance on Defendant's free-and-clear advisement unreasonable, Defendant's *in pari delicto* argument — that Defendant is not liable because Plaintiff and Mr. Reid were equal wrongdoers — fails. (*See* Def. Br. 14-16). That is, the parties were not equal wrongdoers because Defendant plausibly had superior expertise. *See generally Republic of Iraq* v. *ABB AG*, 768 F.3d 145, 160 (2d Cir. 2014) ("The doctrine of *in pari delicto*, a term meaning 'of equal fault,' reflects the principle that a plaintiff who has participated in wrongdoing equally with another person may not recover from that other person damages resulting from the wrongdoing.").

Mr. Reid) did not have specialized expertise equivalent to Defendant that would render its reliance on Defendant's alleged misrepresentation unreasonable, Defendant's challenges to Count III fail at this stage of the litigation.

**4. Plaintiff Has Stated a Claim for Gross Negligence (Count I)**

The remaining tort claim is for gross negligence (Count I), which is essentially a claim for recklessness. (Compl. ¶¶ 76-81). Plaintiff alleges that Defendant "recklessly failed to comply with the September Cooley Letter and its own records that reflected the actual number of shares that could be transferred to [Plaintiff]'s Piper [Sandler] account" and, further, that "[t]his conduct was more egregious than a mere failure to exercise ordinary care and 'smacks' of intentional wrongdoing." (*Id.* ¶ 80). To combat this claim, Defendant relies on its preceding challenges to the other negligence claims, arguing only that because those claims fail, so should the gross negligence claim. (Def. Br. 20). That argument is necessarily unsuccessful, because the other negligence claims survive. In addition, a quick review of the requirements for a gross negligence claim confirms that Count I states a claim.

"Under New York law, a claim for gross negligence requires the standard elements of negligence, plus the elevated standard of reckless or intentional behavior." *Colabella* v. *Cronus Home Inspection LLC*, No. 25 Civ. 4448 (NSR), 2026 WL 2583088, at *4 (S.D.N.Y. Sept. 1, 2026) (citing *Finsel* v. *Wachala*, 915 N.Y.S.2d 323, 325 (3d Dep't 2010)). "Gross negligence is 'conduct that evinces a reckless disregard for the rights of others or "smacks" of intentional wrongdoing.'" *Am. Tel. & Tel. Co.* v. *City of New York*, 83 F.3d 549, 556 (2d Cir.

1996) (quoting *Colnaghi, U.S.A., Ltd.* v. *Jewelers Prot. Servs., Ltd.*, 81 N.Y.2d 821, 823-24 (1993)). Although the Complaint does not quite allege that Defendant's mistaken free-and-clear advisement smacks of intentional wrongdoing, it does plausibly allege that this advisement was reckless and "an extreme departure from the standards of ordinary care." *Colabella*, 2026 WL 2583088, at *4.

Specifically, the Complaint alleges that Plaintiff sent a Legend Removal Letter to Defendant requesting transfer of 1,738,002 Founder Shares. (Compl. ¶¶ 49-50). This request was, of course, impossible to honor given the Issuer Restrictions, which is why it understandably caused confusion among Defendant's employees and prompted them to search for verification of the number of Founder Shares eligible for transfer. (*See id.* ¶¶ 52-55). Ms. Cezaire asked Mr. Reid and Mr. Johnson for another set of the legend removal documents. (*Id.* ¶ 52). And she asked for a copy of the September Cooley Letter, even though Cooley had sent it to Defendant and not to Plaintiff, Mr. Reid, or Piper Sandler. (*Id.* ¶¶ 44, 52). Mr. Johnson reminded her of this fact and got no response for two days. (*Id.* ¶¶ 52-53). He followed up, asking (for the second time) whether he should obtain the September Cooley Letter himself. (*Id.* ¶ 53; *id.*, Ex. J). Minutes later, Ms. Wyllie responded and clarified that Defendant did not have the September Cooley Letter, even though Defendant apparently had previously represented that it did. (*Id.* ¶ 53; *id.*, Ex. J). Then, after three days of radio silence, Ms. Cezaire suddenly advised that "[t]he shares are now free and clear" (*id.* ¶ 54 (emphasis omitted) (quoting *id.*,

Ex. J)), after which Defendant transferred all 1,738,002 remaining Founder Shares to Plaintiff's brokerage account (*id.* ¶ 57).

As transfer agent, Defendant was charged with keeping track of how many Rigetti shares Plaintiff held and which restrictions applied. (Compl. ¶¶ 21-24, 36, 44). Its failure to properly discharge this responsibility — despite Cooley's guidance regarding Plaintiff's ownership and despite Mr. Johnson's reminders that the September Cooler Letter was relevant — compounded by Defendant's failure to reference that letter (or even to locate it in the first place) before summarily informing Plaintiff that all of its shares were free and clear, plausibly evinces reckless disregard and an extreme departure from the standards of ordinary care Defendant should have otherwise exercised. *See In re Farxiga (dapagliflozin) Prods. Liab. Litig.*, No. 17 Misc. 2776 (LGS), 2018 WL 1274929, at *2, 6 (S.D.N.Y. Mar. 9, 2018) (finding gross negligence claim plausibly pleaded under analogous Texas law where defendants possessed information that their clinical drugs had significant risks of side effects but produced the drugs without any warnings anyway); *Travelers Indem. Co. of Conn.* v. *Losco Grp., Inc.*, 136 F. Supp. 2d 253, 257 (S.D.N.Y. 2001) (sustaining gross negligence claim where defendant permitted the erection of steel trusses that differed from the shop drawings, and where defendant failed to inspect them, test them, or verify the welder's certifications). Count I therefore states a claim for gross negligence.

### 5. Plaintiff Has Failed to State a Claim for Breach of Contract (Count V) Because It Was Not a Third-Party Beneficiary of the Transfer Agency Agreement

Moving from tort to contract-based claims, Plaintiff alleges in Count V that Defendant breached the Transfer Agency Agreement by failing to perform services it owed to shareholders "in a professional and workmanlike manner in accordance with generally accepted industry standards." (Compl. ¶ 33 (quoting *id.*, Ex. B at 3); *see id.* ¶¶ 104-105). Because Plaintiff was not a third-party beneficiary of the Agreement, this claim fails.

The parties agree that the continuing vitality of Count V depends on whether Plaintiff is a third-party beneficiary of the Agreement. (Def. Br. 21-22; Pl. Opp. 23-25). "It is old law that a third party may sue as a beneficiary on a contract made for his benefit." *Port Chester Elec. Constr. Co.* v. *Atlas*, 40 N.Y.2d 652, 655 (1976). "However, an intent to benefit the third party must be shown ..., and, absent such intent, the third party is merely an incidental beneficiary with no right to enforce the particular contracts." *Id.* The Court of Appeals has "previously sanctioned a third party's right to enforce a contract in two situations: [i] when the third party is the only one who could recover for the breach of contract or [ii] when it is otherwise clear from the language of the contract that there was 'an intent to permit enforcement by the third party.'" *Dormitory Auth.* v. *Samson Constr. Co.*, 30 N.Y.3d 704, 710 (2018) (quoting *Fourth Ocean Putnam Corp.* v *Interstate Wrecking Co.*, 66 N.Y.2d 38, 45 (1985)).

The first situation is not in dispute; no one argues that Plaintiff alone, as opposed to Rigetti (the other party to the Agreement), could recover for a breach

of the Agreement. Focusing on the second situation then, the parties debate the extent to which an intent to benefit Plaintiff, as a third party, must be apparent from the face of the Agreement. Defendant argues that there must be "clear language on the face of the [Agreement]." (Def. Br. 21 (quoting *U.S. Bank Nat'l Ass'n* v. *GreenPoint Mortg. Funding, Inc.*, 965 N.Y.S.2d 401, 402 (1st Dep't 2013))). Plaintiff rejoins that "the obligation to perform to the third[-]party beneficiary need not be expressly stated in the contract," and that "the identity of a third-party beneficiary need not be set forth in the contract or, for that matter, even be known as of the time of its execution." (Pl. Opp. 23-24 (quoting *Northwell Health, Inc.* v. *Premera Blue Cross*, No. 23 Civ. 389 (JS) (ST), 2025 WL 959651, at *32 (E.D.N.Y. Mar. 15, 2025) (internal quotation marks and citations omitted))).

Irrespective of how plain the Agreement's intent to benefit Plaintiff need be under New York law, a review of the Complaint's allegations about the Agreement reveals that Rigetti and Defendant are the primary beneficiaries, and Plaintiff is only an incidental beneficiary. (*See* Compl. ¶¶ 25-33). Even though the Agreement mentions "Shareholders" like Plaintiff, those mentions do not evince an intent to permit shareholders' enforcement of the contract. *See Dormitory Auth.*, 30 N.Y.3d at 710. Perhaps Plaintiff's strongest argument on this point is that the Agreement authorized Defendant to establish a program for shareholders to sell shares held in book-entry form. (*See* Compl. ¶ 27). But because a transfer agent is hired by the issuer to aid it in giving shares to shareholders in the first instance (*see id.* ¶ 21), the fact that the

Agreement created a system for shareholders to eventually take custody of their shares is hardly indicative of an intent to permit shareholders to enforce performance of the program. Rather, it is Rigetti, as the party who contracted with Defendant to create the program in the first place, who should enforce any breakdown the program suffers. *See Mendel* v. *Henry Phipps Plaza W., Inc.*, 6 N.Y.3d 783, 786 (2006) (explaining that the benefit to the third party must be "sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [the third party] if the benefit is lost" (internal quotation marks and citation omitted)).

The remaining provisions of the Agreement that Plaintiff invokes are likewise insufficiently compelling to support a finding of third-party beneficiary status. Plaintiff cites various "Services" that Defendant must provide to shareholders under the terms of the Agreement, including (i) opening, maintaining, and closing shareholder accounts; (ii) handling shareholder inquiries; (iii) processing routine transfers; (iv) sending e-mail inquiries concerning shareholders' accounts; and (v) providing assistance to shareholders related to their securities holdings as they initiate account inquiries or perform transactions. (Compl. ¶¶ 29-32). But it is no clearer from these services that the Agreement intended to permit shareholders like Plaintiff, rather than Rigetti, to enforce them.

To reason by analogy, in *Logan-Baldwin* v. *L.S.M. General Contractors, Inc.*, 942 N.Y.S.2d 718 (4th Dep't 2012), the court explained that in agreements between general contractors and subcontractors who merely supply materials,

the homeowner is generally deemed an incidental beneficiary "because the materials could, in theory, be used by anyone at any property." *Id.* at 722. So too here: Because Rigetti supplied shares for Defendant to deploy, and any shareholder, not just Plaintiff, could in theory own those shares, Plaintiff was only an incidental beneficiary of the Agreement. *See Dormitory Auth.*, 30 N.Y.3d at 710-11 (finding no intent to permit enforcement by the third party because "although the performance of a construction-related contract may benefit a third-party end user, that does not in itself establish enforcement rights in that third party" (citing Restatement (Second) of Contracts § 302, Comment e, Illustration 19)); *Port Chester Elec. Constr. Co.*, 40 N.Y.2d at 656 (finding that subcontractor was not a third-party beneficiary because the contract did not "expressly state that the intention of the contracting parties [was] to benefit a third party"); *Van Vleet* v. *Rhulen Agency Inc.*, 578 N.Y.S.2d 941, 943 (3d Dep't 1992) (finding that plaintiff was third-party beneficiary where she was explicitly "named in the agreement"). Accordingly, the Court dismisses Count V.

**6. The Court Declines to Stay This Case Pending Arbitration**

Finally, Defendant asks the Court to stay any surviving claims pending the completion of Plaintiff's arbitration with Piper Sandler. (Def. Br. 26-27). But because this case involves a different defendant against whom Plaintiff may separately recover damages, the Court declines to exercise its inherent power to stay this case. To be sure, "[u]nder its inherent power to manage its docket, a district court can stay a case pending arbitration when the

arbitration may determine issues involved in the case, even when the parties to the stayed action are not the parties involved in the arbitration." *Donjon Marine Co.* v. *Water Quality Ins. Syndicate*, 523 F. App'x 738, 740 (2d Cir. 2013) (summary order). The Second Circuit has made clear, however, that "[t]he party seeking the stay has the heavy burden of establishing that it has not taken nor will take any steps to hamper the progress of the arbitration proceeding, that the arbitration may be expected to conclude within a reasonable time, and that such delay as may occur will not work undue hardship." *Id.* (alteration adopted) (internal quotation marks and citations omitted). Defendant has failed to make that showing here.

**CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss is GRANTED IN PART and DENIED IN PART. The Court DISMISSES Count V with prejudice. The remaining claims survive.

Defendant shall file an answer to the Complaint on or before **October 20, 2026**. On or before **November 3, 2026**, the parties shall submit to the Court a joint letter and proposed case management plan in accordance with the specifications laid out in the Notice of Initial Pretrial Conference. (*See* Dkt. #4). If the parties wish to have a conference to discuss case management concerns, they may so request in their joint letter.

The Clerk of Court is directed to terminate the pending motion at docket entry 16.

SO ORDERED.

Dated: September 29, 2026
New York, New York

Katherine Polk Failla

KATHERINE POLK FAILLA
United States District Judge